**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATEY L. GULA, | ) | CASE NO. 5:23-CV-00417-JRA |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | JOHN R. ADAMS |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     INTRODUCTION

Plaintiff Katey L. Gula ("Ms. Gula") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). U.S. District Judge John R. Adams has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

## II.    PROCEDURAL HISTORY

Ms. Gula filed an application for DIB on October 21, 2020, and an application for SSI on March 10, 2021. Her applications related to migraines; endometriosis; status-post hysterectomy; degenerative disc disease of the cervical and lumbar spine with radiculopathy; bilateral carpal tunnel syndrome; hypersomnia; anxiety disorder; PTSD; dysthymic disorder; and conversion disorder. (Tr. 19.)  Her applications were denied initially and upon reconsideration. (Tr. 223-48, 255-64.) On December 15, 2021, an ALJ held an online video hearing due to the COVID-19

pandemic where Ms. Gula, represented by counsel, and a vocational expert ("VE") testified. (Tr. 35-76.) The ALJ issued a written decision on February 3, 2022, finding Ms. Gula is not disabled under the meaning of the Social Security Act. (Tr. 27.) The ALJ's decision became final on January 4, 2023, when the Appeals Council declined further review. (Tr. 1-7.) Ms. Gula filed a Complaint on March 2, 2023, challenging the Commissioner's final decision. (ECF No. 1.) She raises the following assignments of error:

> (1) The ALJ erred when he failed to discuss the opinions of the treating source and failed to incorporate the stated limitations into the RFC.

> (2) The ALJ erred when he failed to properly evaluate Plaintiff's migraine headaches at Step Three of the Sequential Evaluation.

> (3) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and found that the effect of the combination of Plaintiff's symptoms, including pain, allowed her to engage in substantial gainful activity on a full-time and sustained basis.

(ECF No. 7, PageID#2135.)

## III.    BACKGROUND INFORMATION

### A. *Personal, Educational, and Vocational Experience*

Ms. Gula was born in 1983, and she was 37 years old on the alleged disability onset date. (Tr. 46.) She lives with her 10-year-old son, and her 19-year-old daughter occasionally stays with her. (Tr. 42.) She is not married. (Tr. 43.) She has a driver's license, though her doctor restricted her from driving. (Tr. 43-44.) She has an associate degree, a bachelor's degree in video production, and a master's degree in marketing. (Tr. 44.) She testified that she was six courses away from a master's degree in industrial organizational psychology. (*Id.*) Her past relevant work was employment as a case manager and sales clerk. (Tr. 25.)

**B.** *Relevant Statements and Hearing Testimony*

### 1. <u>Disability Reports</u>

Ms. Gula alleged that she is disabled due to PTSD, anxiety, dysthymia, hypersomnia, lumbar stenosis, syncope and collapse, hypothyroid, endometriosis, hormone deficiencies, and arthritis. (Tr. 364.) She reported that she has continued to be "triggered" by incidents of childhood abuse that affect her ability to function and complete work duties. (Tr. 382-83.) She indicated that she has fallen asleep several times while at work or driving, and she suffers from lightheadedness and dimming vision that has resulted in falls. (*Id.*) At the reconsideration level, Ms. Gula alleged that her symptoms of PTSD, syncope, collapse, and hypersomnia had increased. (Tr. 387, 399.)

### 2. <u>Ms. Gula's Testimony</u>

Ms. Gula testified that she receives a stipend from the Department of Veterans Affairs to care for her father, which takes about 10 hours per week, and she is involved in managing his finances. (Tr. 43.) She experiences episodes of syncope/seizures in which everything goes dark and she falls to the ground. (Tr. 53-55.) She experiences migraines once or twice a month that cause vomiting and require her to be in the dark. (Tr. 55-56.) She takes Maxalt for her migraines. (Tr. 56.) When asked if the medication helps, Ms. Gula reported that Maxalt was "all right."

Ms. Gula also reported that she has pain or stiffness in her neck that at times makes it difficult to look side to side or up and down. (Tr. 57-58.) She has difficulty reaching over her head on her right side. (Tr. 58.) She has pain shooting down to her right hand, which often causes her to drop items. (*Id.* at 58-59.) She testified that she has carpal tunnel syndrome. (*Id.*) She testified that she previously had pain in her low back, but this has not occurred since her hysterectomy that followed a diagnosis of endometriosis. (Tr. 59.) She stated that 30 pounds is the heaviest weight

she can lift, and she needs to frequently stand whenever she is seated for an extended period. (Tr. 60.)

Ms. Gula stated that she suffers anxiety related to her PTSD and is often scared to be around others. (*See* Tr. 61-62.) She testified that she has two to three panic attacks a month, difficulty focusing, impulsive behavior, and depression. (Tr. 62-64.) She sleeps approximately 12 hours a day. (Tr. 64.) Regarding daily activities, Ms. Gula testified that she manages personal hygiene, laundry, dishes, cooking, and cleaning, but she sometimes has others "back her up" when her depression flared. (Tr. 66-67.) She also stated that she has Sunday family dinner for her children and enjoys swimming, fishing, spending time with her son, crafting, and playing guitar. (Tr. 67.) She stated that when working, she would have to call her boss because she would have a "breakdown" and would be unable to leave her home. (Tr. 68.) She testified that she experiences such a breakdown where she is unable to leave her home for a week each month. (*Id.*)

### 3. <u>Vocational Expert's Testimony</u>

The ALJ first asked the VE whether a hypothetical individual with Ms. Gula's age, education, and experience could perform work at the light exertional level, except limited to frequent handling or fingering; occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; no exposure to unprotected heights, hazardous machinery, or commercial driving; performance of simple, routine tasks and simple work-related decisions; occasional interactions with supervisors, coworkers, or the general public; and tolerating few changes in a routine work setting. (Tr. 71.) The VE opined that the individual could not perform past relevant work but could perform work as a cleaner, price marker, and mail clerk. (Tr. 72.)

The ALJ then asked the VE whether the individual from the first hypothetical could perform work if additionally limited to being off task 20 percent of the time and absent three times per month. (Tr. 72.) The VE opined there would be no work available. (*Id.*)

The ALJ asked the VE what general tolerance employers will have for time off task or absenteeism. (*Id.*) The VE opined that employers would tolerate an employer being off task no more than 10 percent of the time and one absence per month. (*Id.*)

### C.  *Relevant Non-Medical/Medical Opinion Evidence*

#### 1.  <u>State Agency Opinions</u>

In January 2021, Courtney Zeuene, Psy.D., and Lynne Torello, M.D., reviewed Ms. Gula's medical records at the initial level of consideration. Dr. Zeune opined that Ms. Gula could perform simple and complex tasks in an environment without fast pace or quotas, interact with others occasionally and superficially, and work where there were infrequent major changes. (Tr. 231-32.) Lynne Torello, M.D., opined that Ms. Gula did not have a severe physical impairment. (Tr. 228.)

In June 2021, Cindy Matyi, Ph.D., reviewed Ms. Gula's records and agreed with limitations that Dr. Zeune opined. (Tr. 241-32.) Diane Manos, M.D., however, disagreed with Dr. Torello's severity finding, and opined that Ms. Gula could perform no more than a limited range of light work. (Tr. 239-41.)

#### 2.  <u>Anissa Fuller, LISW-S</u>

In May 2021, Ms. Fuller, Ms. Gula's counselor, wrote a letter in follow up to a request regarding Ms. Gula's disability claim. (Tr. 1333.) Ms. Fuller noted that Ms. Gula initiated outpatient counseling services on November 9, 2020, requesting support surrounding recent memory of multiple sexual assault incidents she experienced as a child and reoccurring intrusive thoughts, flashbacks, and physiological distress symptoms related to these assaults. (*Id.*) Ms. Fuller

5

opined that Ms. Gula "may have difficulty in maintain concentration and responding to work pressure based on her flashbacks and intrusive thoughts." (*Id.*)

### 3. Michael Oros, M.D.

In December 2020, Dr. Oros wrote a letter to Ms. Gula's university. (Tr. 2111.) Dr. Oros noted that Ms. Gula was receiving medical treatment for her PTSD and psychotherapy. (*Id.*) Dr. Oros also stated that Ms. Gula began to experience a "pronounced exacerbation of her symptoms due to triggering and subsequent memory of a significant past assault perpetrated against her." (*Id.*) Dr. Oros opined that Ms. Gula's PTSD "has greatly impacted her daily global functioning," and that she has also experienced a gross decline in cognitive tasking." (*Id.*)

### D. *Relevant Medical Evidence*

### 1. Migraine Headaches, Hypersomnia, Conversion Disorder

Prior to the alleged onset date, the medical record reflect Ms. Gula was receiving treatment for hypersomnia and an alteration of awareness. (Tr. 813.) These were thought to be possibly related to a conversion disorder[1] given that a brain MRI and EEG were normal. (*Id.*) A March 23, 2020, polysomnogram revealed periodic limb movement disorder and hypersomnia. (Tr. 819-20.)

On November 6, 2020, Ms. Gula attended an office visit regarding her hypersomnia, right hip pain, and conversion disorder. (Tr. 834.) She reported that her migraine headaches had returned, and that she was getting them once or twice per week. (*Id.*) She was "light sensitive" at the appointment. (*Id.*) A brain MRI and two EEGs from 2015 were normal. (*Id.*) She had a past diagnosis of conversion disorder. (*Id.*) Damien Earl, M.D., started Ms. Gula on duloxetine for her headaches. (Tr. 837.)

---

[1] Conversion disorder is a mental disorder in which emotional distress or unconscious conflict are expressed through physical and sensory symptoms. *See Conversion Disorder*, Stedman's Medical Dictionary 259850 (Nov. 2014); Cleveland Clinic, *Conversion Disorder*, https://my.clevelandclinic.org/health/diseases/17975-conversion-disorder (last visited Jan. 16, 2024).

On May 21, 2021, Dr. Earl noted that Ms. Gula continued to complain of excessive sleepiness and an increase in her migraines—two to three migraines per week. (Tr. 1337.) She stated that she experienced "full blown throbbing" migraines with light sensitivity lasting four or more hours. (*Id.*) Dr. Earl stopped duloxetine and started Ms. Gula on Topamax prophylactically and Maxalt as needed. (*Id.*) Ms. Gula reported that her medications (Tylenol, Maxalt, and Imitrex) "help[ed] some." (*Id.*) Upon examination, Ms. Gula had grossly intact concentration, memory, and speech, with normal gait. (*Id.*) Dr. Gula changed her medication to Provigil. (*Id.*)

On July 15, 2021, Ms. Gula established care with Xian Wen Jin, M.D., for her conversion disorder with symptoms of intermittent dizziness and confusion. (Tr. 1585.) Dr. Jin assessed Ms. Gula with generalized abdominal pain, chronic PTSD, twitching, and hypothyroidism. (Tr. 1587.)

On August 25, 2021, Ms. Gula went to the emergency room with complaints of headaches, dizziness, photosensitivity, and neck and shoulder pain. (Tr. 1603.) She reported she was involved in a motor vehicle accidented where she "rear-ended" a truck in front of her. (*Id.*) She stated that she was having abdominal pain related to her seatbelt.  She testified that she was seen at another hospital, and that the other hospital conducted a CT scan with unremarkable results. (*Id.*) Ms. Gula's neurologic examination was normal. (Tr. 1604.)

On September 10, 2021, Ms. Gula presented for a post-concussion visit with complaints of chest congestion without facial pain and "persistent headaches." (Tr. 1935.) She reported that she alternates using with Tylenol and ibuprofen for pain. (*Id.*) She was taking Maxalt "with some improvement." (*Id.*)

On September 23, 2021, Ms. Gula presented for a follow-up appointment regarding her headaches. (Tr. 2098.) She reported that medications were "helping" her headaches, but she was

experiencing ear pain, facial pain, and vertiginous feeling, which her medical provider described as "atypical for typical migraines." (Tr. 2101.)

On October 8, 2021, Ms. Gula was hospitalized to further assess her complaints of hypersomnia and syncope. (Tr. 1740.) However, testing showed normal scans and EEG results and neurologists were unable to find any anomalies. (Tr. 2057.) Najm Imad, M.D., diagnosed Ms. Gula with conversion disorder. (*Id.*)

### 2.  Endometriosis

On December 20, 2019, Ms. Gula underwent a fulguration of peritoneal endometriosis and right ovarian cystectomy after experiencing abdominal pain. (Tr. 1016.) On July 15, 2021, Ms. Gula began experiencing an increase in abdominal pain that she believed to be similar to her past endometriosis flares. (Tr. 1585.) On August 26, 2021, Nicholas Sherock, D.O, performed a hysterectomy in order to address Ms. Gula's continuing endometriosis. (Tr. 1680.)

### 3.  Degenerative Disc Disease and Carpal Tunnel Syndrome

A February 2020 MRI of Ms. Gula's lumbar spine revealed mild multilevel degenerative changes without stenosis. (Tr. 815.) Ms. Gula underwent physical therapy and chiropractic care, and she also used a TENS unit for her lumbar stenosis with radiculopathy. (Tr. 803-09.)

Ms. Gula attended a neurology appointment on November 6, 2020. (Tr. 834.) She reported pain and numbness in her arms and hands, along with grip weakness. (*Id.*). Dr. Earl recommended that Ms. Gula undergo an MRI of her cervical spine to further assess her complaints. (Tr. 838.) Ms. Gula's December 2020 MRI revealed only mild degenerative changes with no significant stenosis. (Tr. 1337.) Dr. Earl diagnosed Ms. Gula with bilateral carpal tunnel syndrome on May 21, 2021, after confirming that there was no radicular component to her cervical disc disease. (Tr.

1338.) On June 23, 2021, Ms. Gula had unremarkable EMG testing in her upper extremities. (Tr. 2106.)

### 4.  Mental Conditions

Prior to the alleged onset date, Michael Oros, M.D., treated Ms. Gula and diagnosed her with PTSD, dysthymia, and generalized anxiety disorder. (Tr. 883.) At a July 2020 visit, Ms. Gula told Dr. Oros that her anxiety and dysthymia symptoms had worsened and, although she was not having nightmares or flashbacks, she felt "on edge" more often. (Tr. 880.)

On August 3, 2020, Ms. Gula saw Dr. Oros. She continued to struggle with her mood and anxiety and reported that many personal issues in her life, *i.e.,* her ex-husband and problems dealing with her daughter and stepfather, exacerbated these issues. (Tr. 872-73.) On September 8, 2020, Dr. Oros added Lexapro to Ms. Gula's regimen of psychotropic medication. (Tr. 870.) From November 9, 2020, to September 16, 2021, Ms. Gula attended counseling sessions, where she worked on techniques to improve her mood and control the symptoms of her PTSD. (Tr. 1365-96.) Ms. Gula was active at these sessions and appeared to make some progress, as she at times reported an improved mood and successfully using calming techniques. (*See, e.g.*, Tr. 1369.)

On April 7, 2021, Ms. Gula reported that she was irritable and having nightmares, though she was not currently feeling depression and had been keeping busy with paperwork and DIY projects. (Tr. 1270.) She reported having no improvement in her nightmares and experiencing situation-based anxiety, though doing trauma-centered yoga helps. (*Id.*)

### IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Gula met the insured status requirements of the Social Security Act through December 31, 2025. (Tr. 19.) The ALJ then determined that Ms. Gula had not engaged in substantial gainful activity since July 23, 2020 (the alleged disability onset date). (*Id.*) The ALJ determined that Ms. Gula has the following severe impairments: migraines;

endometriosis; status-post hysterectomy; degenerative disc disease of the cervical and lumbar spine with radiculopathy; bilateral carpal tunnel syndrome; hypersomnia; anxiety disorder; PTSD; dysthymic disorder; and conversion disorder. (*Id.*) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 19-21.)

The ALJ also determined that Ms. Gula has the residual functional capacity to perform light work, except that she can frequently handle and finger with her bilateral upper extremities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stop, kneel, crouch, and crawl; have no exposure to unprotected heights or hazardous machinery; and can do no commercial driving. (Tr. 21.) The ALJ also determined that Ms. Gula should be limited to simple, routine tasks and simple work-related decision and occasional interactions with supervisors, co-workers, and the general public, and that Ms. Gula could tolerate few changes in a routine work setting. (*Id.*)

The ALJ next determined that Ms. Gula is unable to perform any past relevant work. (Tr. 25.) The ALJ explained that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Gula is "not disabled," whether or not she has transferable job skills. (*Id.*) Considering Ms. Gula's age, education, work experience, and residual functional capacity, the ALJ determined there are other jobs that exist in significant numbers in the national economy that Ms. Gula could perform, including employment as a cleaner, price marker, and mail clerk. (Tr. 26.) Accordingly, the ALJ concluded that Ms. Gula is not disabled, as defined in the Social Security Act, from the alleged disability onset date through the date of the ALJ's decision. (Tr. 26-27.)

## V.     LAW & ANALYSIS

### A.  *Standard of Review*

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. *Standard for Disability*

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. *Analysis*

**1. Substantial Evidence Supports the Mental Limitations from the RFC, Which Was Based in Part on the Persuasive Medical Opinions of Dr. Oros and Ms. Fuller.**

Ms. Gula argues that the ALJ's RFC determination omitted mental limitations from the medical opinions of psychiatrist Dr. Oros and counselor Ms. Fuller. (ECF No. 7, PageID#2142-45.) She contends that remand is warranted because the ALJ did not provide a "coherent explanation" when addressing the opined limitations from Dr. Oros and Ms. Fuller. (*Id.* at PageID#2145.) In response, the Commissioner maintains that Ms. Gula does not demonstrate that the RFC determination is not supported by substantial evidence because does she not compare Dr. Oros' or Ms. Fuller's opinions with the RFC determination, nor does she attempt to demonstrate how these opinions and the RFC determination are inconsistent with each other. (ECF No. 7, PageID#2166-70.) Ms. Gula (*Id.* at PageID#2167-68.) The Commissioner also states that even if Ms. Gula made such a showing, no legal authority requires the ALJ to include the opinions verbatim in the RFC. (*Id.* at PageID#2168-69.) The Commissioner further argues that the RFC assessment was based on the persuasive medical opinion evidence and the record as a whole, including the state agency findings, Ms. Gula's complaints, the objective medical evidence, and other factors. (*Id.* at PageID#2169.) Thus, the Commissioner maintains that substantial evidence supports the ALJ's findings. (*Id.* at PageID#2169-70.) The Commissioner's arguments are well-taken.

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished). The ALJ may make necessary decisions about which medical findings to credit and which to reject in

13

determining the claimant's RFC as long as the ALJ's RFC determination considered the entire record. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013); *Lane v. Comm'r of Soc. Sec.*, No. 3:20-cv-1105, 2021 WL 8342836, at *12 (N.D. Ohio May 24, 2021), *report and recommendation adopted*, 2023 WL 2733549 (N.D. Ohio Mar. 31, 2023). However, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, or explain why he chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 WL 1933405, at *13 (N.D. Ohio Apr. 24, 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer*, 774 F. Supp. 2d at 881 (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

Here, the ALJ found the opinions of Dr. Oros and Nurse Fuller persuasive. Dr. Oros opined that Ms. Gula's PTSD "has greatly impacted her daily global functioning," and that she experienced "a gross decline in cognitive tasking." (Tr. 25.) The ALJ determined that this opinion was persuasive because it generally comported with Dr. Oros' treatment records and Ms. Gula's "rather complicated conversion disorder." (Tr. 25.) But the ALJ noted that these opined limitations were in a letter from Dr. Oros to Ms. Gula's university as she "returns to academic life," suggesting that Ms. Gula is able to perform some academic tasks. (Tr. 25, 2111.) The ALJ also compared Dr. Oros' opinions with Ms. Gula's reported daily activities of being able to care for her family and attend to other chores. (Tr. 25, 66-7.) Thus, while the ALJ concluded that Dr. Oros' opinion showed Ms. Gula had limitations, the ALJ noted that other facts supported that Ms. Gula was able to perform "at some level" and qualified his RFC determination accordingly. (Tr. 25.)

Ms. Fuller opined that Ms. Gula "may have difficulty in maintaining concentration and responding to work pressure based on her flashbacks and intrusive thoughts," which the ALJ found to be consistent with Ms. Fuller's records and Ms. Gula's complaints. (Tr. 24-25, 1333.) While the ALJ determined that Ms. Fuller's opinion was vague, the ALJ explained that he would accommodate her opinion by limiting Ms. Gula to simple, routine tasks and no more than occasional interactions. (Tr. 25.) Although Ms. Gula contends that the ALJ did not provide limitations for maintaining concentration and responding to work pressure, Ms. Fuller's opinion was vague, unclear, and did not identify more specific limitations that the ALJ could have imposed. Ms. Gula's argument also does not offer any explanation as to how the ALJ's stated limitations did not adequately address Ms. Fuller's opined limitations.

A review of the ALJ's decision reflects that the ALJ provided the persuasiveness finding required by agency regulations, reconciled the opinions with the evidence, and provided explicit RFC limitations accounting for the opinions of Dr. Oros and Ms. Fuller's persuasive opinions. Ms. Gula offers no argument or explanation as to how it was unreasonable for the ALJ to translate the medical opinions to the RFC determination in this matter. When an ALJ evaluates a claimant's ability to perform unskilled work, a claimant must be capable of (1) understanding, carrying out, and remembering simple instructions, (2) using judgment, (3) responding appropriately to supervision, co-workers, and usual work situations, and (4) dealing with changes in a routine work setting. *See* SSR 96-8p, 1996 WL 374184, at *6.

With respect to Dr. Oros' opinion, Ms. Gula does not demonstrate how it was unreasonable that a person that has limitations in "global function" and "cognitive tasking" that was planning to attend college could not perform work that is limited to simple, routine tasks and simple work-related decisions, and can tolerate few changes in a routine work setting. (Tr. 21.) As to Ms.

Fuller's opinion, Ms. Gula does not demonstrate that a person with restrictions in concentration and responding to work pressure cannot do simple tasks that do not require more than simple decisions or more than few changes in her routine. (*Id.*); *see, e.g.*, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436-37 (6th Cir. 2014) ("In other words, the limitation to simple tasks portrays the tasks that she can perform without being affected by her moderate limitations."); *Starr v. Comm'r of Soc. Sec.*, No. 2:12-cv-290, 2013 WL 653280, at * (S.D. Ohio Feb. 21, 2013) (finding that an ALJ adequately accounted for claimant's deficiency in concentration by limiting claimant to "simple routine work involving no more than 3-4 steps").

Moreover, even if the ALJ found these opinions persuasive, the ALJ is not required to adopt the opinions' limitations or restrictions "verbatim." *See Daniels v. Comm'r of Soc. Sec.*, No. 3:19-CV-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020). The regulations, at a minimum, require the ALJ to sufficiently articulate how he considered the supportability and consistency of a medical opinion. 20 C.F.R. § 404.1520c(a). If the ALJ provides sufficient articulation, an ALJ may find a medical opinion generally persuasive and adopt the opined limitations either in whole or in part. *Kerns v. Kijakazi*, No. 2:20-cv-265-DCP, 2022 WL 1110079, at *7 (E.D. Tenn. Apr. 13, 2022) (referring to 20 C.F.R. § 404.1520c(a)). Finally, the RFC assessment is based on the record as a whole, *not* just the persuasive medical opinion evidence. *See Justice*, 515 F. App'x at 587; 20 C.F.R. § 404.1545(a). Here, the ALJ's RFC determination was also based on the ALJ's consideration of the state agency findings, Ms. Gula's complaints, the objective medical evidence and other factors. *See, e.g.*, 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2017 WL 5180304, at *3-4, 9. Notably, the ALJ observed that Ms. Gula was more psychologically limited than what the state agency psychologists opined. (Tr. 24.) For example, while finding that the state agency's Paragraph B criteria and resulting limitations were supported

by Ms. Gula's health records, mental health treatment, and testimony, the ALJ eliminated complex tasks based upon Ms. Gula's "continuing struggles with her anxiety and PTSD symptoms." (Tr. 24.) Thus, the ALJ included additional mental restrictions in the RFC beyond those described in the consultants' opinions. The ALJ's consideration of the record, including the state agency findings, reflects that the RFC assessment was based on the record as a whole.

In sum, while Ms. Gula argues that the ALJ "failed to give a coherent explanation" for the mental RFC determination, she does not directly address the ALJ's findings or challenge the evidence the ALJ used in reaching his conclusions regarding Ms. Gula's mental limitations. To the extent that Ms. Gula invites this Court to reweigh the opinion evidence to impose greater limitations, this request is improper.   A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). This Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Because Ms. Gula does not demonstrate the ALJ's findings lack substantial evidence or that the ALJ erred, Ms. Gula's argument is not well-taken.

## 2.  The ALJ Did Not Properly Evaluate Ms. Gula's Migraine Headaches at Step Three of the Sequential Evaluation Process.

Ms. Gula argues the ALJ erred because he did not cite or apply SSR 19-4p, a ruling that offers guidance for assessing primary headache disorder. (ECF No. 7, PageID#2145-48.) As a result, Ms. Gula contends that the ALJ did not find her presumptively disabled at Step Three of the sequential evaluation process due to her headaches, which SSR 19-4p requires to be considered under Listing 11.02B – the listing for seizure disorder. (*Id.* at PageID#2148.) The Commissioner acknowledges that the ALJ did not cite SSR 19-4p or Listing 11.02B but nevertheless contends

that Ms. Gula does not satisfy Listing 11.02B's criteria because she testified at the hearing that she only had two migraines per month. (ECF No. 11, PageID#2163-64.) The Commissioner also argues that Ms. Gula does not demonstrate that the ALJ overlooked Ms. Gula's headache-related limitations. (*Id.* at PageID#2165-66.) Thus, the Commissioner maintains the ALJ properly evaluated Ms. Gula's migraine headaches at Step Three of the sequential evaluation process. (*Id.* at PageID#2163-66.)

At Step Three of the disability evaluation process, the Commissioner must consider whether a claimant's impairments meet or medically equal any of the relevant listing requirements of 20 C.F.R. Part 404, Subpart P, App. 1, 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). An impairment that meets only some of the requirements of a listing does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Conversely, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant bears the burden of demonstrating that she meets or equals a listed impairment at the third step of the sequential evaluation. *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531 (italics in original).

SSR 19-4p provides specific guidance on how "primary headache disorders" such as migraines are established and evaluated. *See* SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). Specifically, SSR 19-4p explains that there is no Step Three listing for primary headache disorder, but these impairments may be found to be medically equivalent to Listing 11.02B. SSR 19-4p,

2019 WL 4169635, at *7. SSR 19-4p instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for an MDI of a primary headache disorder. *Id.* In relevant part, Listing 11.02B involves "[d]yscognitive seizures" occurring at least once a week for at least 3 consecutive months, despite adherence to a prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 11.02B. In determining whether a claimant's impairments are equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Here, while the Commissioner acknowledges that the ALJ did not consider Listing 11.02B or reference SSR 19-4p. (Tr. 19-20, 22-23), the Commissioner argues that Ms. Gula does not demonstrate that her headaches meet the requirements of Listing 11.02B or that the ALJ overlooked headache-related limitations. Generally, an ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013.) "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415-16 (6th Cir. 2011) (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

19

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether [s]he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria). Thus, the question before this Court is whether Ms. Gula raised a "substantial question" as to whether she satisfied Listing 11.02B.

Ms. Gula presents five pieces of evidence in support of her argument that she satisfied the criteria of Listing 11.02B. First, Ms. Gula cites a February 2020 treatment note that indicates she has a past medical history of migraine headaches. (Tr. 992.) The second piece of evidence is an August 2021 emergency care note where the "History of Present Illness" section indicates that Ms. Gula presented to the emergency room after a car accident with an "achy headache" with reported photosensitivity, periodic dizziness, and neck and shoulder pain. (Tr. 1603.) The note also indicates that Ms. Gula has a past medical history of migraine headaches. (*Id.*)

The third piece of evidence is a September 10, 2021, progress note that stated Ms. Gula complained of "persistent headaches" and alternating between Tylenol and ibuprofen for pain. (Tr. 1935.) She reported that she was taking Maxalt "with some improvement." (*Id.*) The fourth piece of evidence is a September 23, 2021, note for a follow-up appointment for a chronic intractable migraine without aura. (Tr. 2098.) The final piece of evidence is another note from September 23, 2021, where Ms. Gula was assessed with a chronic intractable migraine without aura. (Tr. 2101.)

The provider noted that Ms. Gula's migraine "flared up" after her concussion but that she was reporting ear pain, facial pain, and vertiginous feeling that "seem[ed] atypical for typical migraines." (*Id.*) Ms. Gula was continued on topiramate, which "[was] helping." (*Id.*) Dr. Early also started Ms. Gula on amitriptyline and Maxalt. (*Id.*) The treatment note also indicated that Ms. Gula had reported at her May 2021 visit that she was experiencing daily pressure headaches and **two to three migraines per week**. (*Id.*) (emphasis added).

Although the ALJ did not explicitly consider Listing 11.02B and SSR 19-4p, the ALJ stated the following regarding Ms. Gula's migraines in his SSR 16-3p analysis:

> At a neurology visit in November of 2020, the claimant reported that her migraine headaches had returned, and that she was getting them once or twice per week (5F/25). Dr. Earl started the claimant on duloxetine for her headaches (5F/28). In May of 2021, Dr. Earl noted that the claimant continued to complain of excessive sleepiness and changed her medication to Provigil.
>
> The claimant also reported an increase in her migraines. Dr. Earl stopped the duloxetine and started her on Topamax prophylactically and Maxalt as needed (14F/3). In October of 2021, the claimant was hospitalized in order to further assess her complaints of hypersomnia and syncope. However, extensive testing showed normal scans and EEG results and neurologists were unable to find any anomalies, and Najm Imad, M.D., diagnosed the claimant with a conversion disorder (25F/10, 32F/3).
> …
> From the above, the claimant has some limitations related to her neck and back pain, hypersomnia, migraines, endometriosis, and carpal tunnel syndrome. However, she has required only conservative treatment, and the objective evidence has not revealed any underlying conditions that would support the levels of pain that the claimant has alleged. Moreover, it appears that many of the claimant's physical complaints are related to a conversion disorder. Nonetheless, the undersigned has attempted to accommodate any residual symptoms by limiting her to work at the light exertional level, with the additional manipulative, postural, and environmental restrictions described in the residual functional capacity.

(Tr. 22-23.)

Whether the ALJ adequately considered whether Ms. Gula's migraine headaches medically equaled Listing 11.02B or what limitations her headaches imposed under SSR 19-4p presents a

close call. Regarding the ALJ's consideration of Listing 11.02B and SSR 19-4p, the Commissioner seemingly invites a "harmless error" analysis by acknowledging that Ms. Gula "is right that the ALJ did not cite [SSR 19-4p] or [Listing 11.02B]." (ECF No. 11, PageID#2163.) As the Commissioner points out, Ms. Gula testified at the hearing that she had two migraines per month, which is less than the Listing 11.02b's requirement of at least one listing-level event per week. (*Id.* at PageID#2164.) But Ms. Gula—and the ALJ's cited evidence—presents a conflicting picture. For example, as the ALJ noted, Ms. Gula reported at a November 2020 neurology appointment that she was experiencing migraines once or twice per week. (Tr. 22; *see* Tr. 834.) And at another appointment in May 2021, Ms. Gula reported an increase in migraines—two to three times per week. (Tr. 1337, 2101.) And Ms. Gula reported she was experiencing "persistent" headaches at a September 2021 appointment. (Tr. 1935.)

SSR 19-4p instructs that one of the criteria relevant to medical equivalence with Listing 11.02B is the frequency of headache events. The ALJ discussed—and Ms. Gula cites—evidence regarding the frequency of the headaches that raises at least a substantial question that she meets the frequency requirement of the Listing 12.0B, *i.e.*, migraine headaches "occurring at least once a week for at least 3 consecutive months." *See* 20 C.F.R. Part 404, Subpart P, App. 1, §11.02B. The ALJ's decision does not offer a discernible explanation as to how Ms. Gula's migraine headaches did not satisfy the frequency requirement.

There also is no evidence that Ms. Gula was noncompliant with her prescribed treatment. For example, in November 2020, Ms. Gula was prescribed duloxetine for her migraines. (Tr. 837.) As the ALJ discussed, when Ms. Gula complained of excessive sleepiness in May 2021, Dr. Earl stopped duloxetine and started Ms. Gula on Topamax prophylactically and Maxalt as needed. (Tr. 1337.) At a September 2021 appointment, Ms. Gula reported that she was taking Maxalt "with

some improvement." (Tr. 1935.)  Thus, Ms. Gula points to evidence that demonstrates, at least to some extent, that she may have experienced  migraines despite adherence to treatment. *See* 20 C.F.R. Part 404, Subpart P, App. 1, §11.02B. Therefore, because the record reflects evidence that tends to support that Listing 11.02 is applicable, I recommend that this case should be remanded. *See Corinne C. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1034, 2022 WL 1590818, at *17-20 (S.D. Ohio May 19, 2022) (remanding decision where ALJ did not mention Listing 11.02 and the "record evidence…strongly suggests plaintiff's migraine impairments may have equaled [L]isting 11.02B"); *Willis v. Comm'r of Soc. Sec.*, No. 2:19-cv-11689, 2020 WL 1934932, at *7 (E.D. Mich. Apr. 22, 2020) ("The record evidence on severity, frequency, and adherence, coupled with counsel's direct request, merited, at least, an express consideration of Listing 11.02 and a more robust explanation of equivalency, if not also a medical expert's opinion on Listing 11.02 equivalence."); *Nagy v. Comm'r of Soc. Sec.*, No. 1:22-CV-00368-CEH, 2023 WL 2404061, at *9 (N.D. Ohio Mar. 8, 2023) (remanding for proper evaluation of claimant's chronic daily headaches under Listing 11.02).

### 3.  Substantial Evidence Does Not Support the SSR 16-3p Evaluation of Ms. Gula's Subjective Symptoms.

Ms. Gula argues that the ALJ erred because he failed to properly apply SSR 16-3p's criteria and failed to find that the intensity, persistence, and limiting effects of Ms. Gula's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis. (ECF No. 7, PageID#2148-53.) The Commissioner disagrees. (ECF No 11, PageID#2170-72.)

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* The ALJ must then evaluate the intensity and persistence of the individual's symptoms and

determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources, such as family and friends. *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent

compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id*. (internal quotations and citations omitted).

As stated above, I recommend that this matter be remanded because the ALJ did not properly evaluate Ms. Gula's migraine headaches under Listing 11.02 and SSR 19-4p. The ALJ's evaluation of the evidence on remand may impact his analysis of Ms. Gula's subjective complaints. Upon remand, the ALJ may determine whether the SSR 16-3p analysis should change.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE the Commissioner's final decision and REMAND this case.

Dated: January 25, 2024                              *s/ Jennifer Dowdell Armstrong*
                                                      Jennifer Dowdell Armstrong
                                                      U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also

receive further evidence, recall witnesses or recommit the matter to the Magistrate
Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the
District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).
Objections must be specific and not merely indicate a general objection to the entirety of the
report and recommendation; a general objection has the same effect as would a failure to
object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate
the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same
argument that was presented to the Magistrate Judge without specific objections 'wastes
judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates
Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15,
2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare
cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868,
878-79 (6th Cir. 2019).